F1K9FAIS                        Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 CR 243 (JSR)

5    ROBERT FAIELLA,

6                   Defendant.

7    ------------------------------x

                                           New York, N.Y.
8                                          January 20, 2015
9                                          4:32 p.m.

10
     Before:
11
                      HON. JED S. RAKOFF
12
                                           District Judge
13

14                       APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     ALEXANDER WILSON
17        Assistant United States Attorney

18   SIDLEY AUSTIN LLP
          Attorneys for Defendant
19   TIMOTHY TREANOR
     TODD BEATON
20   DAVID DENTON

21

22

23

24

25

1              (In open court; case called)

2              MR. WILSON:  Good afternoon, your Honor.

3              Alexander Wilson for the government.  With me at

4    counsel table is Special Agent Gary Alford of the IRS.

5              THE COURT:  Good afternoon.

6              MR. TREANOR:  Good afternoon, your Honor.

7              Tim Treanor, Todd Beaton and David Denton for

8    Mr. Faiella, who is sitting next to me.

9              THE COURT:  Good afternoon.

10             We're here for sentence.  The probation office has

11   calculated the guideline range as 57 to 71 months but because

12   of the five-year limitation on the underlying offenses the

13   guideline range is 57 to 60 months.

14             In their excellent submissions or submission -- I

15   don't think I've received anything from the government, but in

16   the submission I received from defense counsel there was no

17   objection to that.

18             That seems right to the Court as well.  Does anyone

19   disagree with that?

20             MR. WILSON:  No, your Honor.

21             MR. TREANOR:  No, your Honor.

22             THE COURT:  Very good.  So that's the guideline range.

23             Now, this Court, of course, must sentence the

24   defendant based on all the factors under Section 3553(a).  And

25   I want to hear from counsel but let me just say that there are

1    a couple of differences between Mr. Faiella and Mr. Shrem, not

2    all of which cut in the same direction, but the one that is

3    most glaring is that this defendant has a prior felony

4    conviction.  So it seems to me that he will have difficulty

5    persuading me to sentence him to the same or less than

6    Mr. Shrem.  There are other factors that are to be considered.

7          On the other hand, Mr. Treanor, maybe I misread your

8    sentencing submission but you don't seem to have indicated what

9    sentence you're proposing -- not that you're required to.  You

10   say you want a sentence no greater than the bottom of this

11   stipulated guideline range which is 57 months.  And even if the

12   government were to argue for the top of the guideline range,

13   namely 60 months, it would not be a very prudent use of this

14   Court's time to quibble as between 57 and 60.  The relevant

15   question is whether it should be any less than 57.

16         So let me hear first from defense counsel, then from

17   government counsel, and then from the defendant if he wishes to

18   be heard.

19         MR. TREANOR:  Thank you, your Honor.

20         Your Honor, with regards to where we would like

21   Mr. Faiella to be sentenced we're mindful of the fact that we

22   stipulated in the plea agreement to an applicable sentencing

23   range.  We wouldn't argue for a sentence below that.

24         THE COURT:  Let me look at the plea agreement.  I'm

25   sorry.  I didn't realize this was -- normally the government

F1K9FAIS                    Sentence

```
 1    doesn't include -- I shouldn't say normally, there are
 2    variations.  Does someone have a copy of the plea agreement?
 3              MR. WILSON:  Yes, your Honor.
 4              THE COURT:  Hand that up please.
 5              MR. TREANOR:  Your Honor, I apologize.  This is what's
 6    called an option B agreement I think by the office, which
 7    permits the defendant to argue under 3553(a) for a sentence
 8    below the range.
 9              THE COURT:  That's the point.
10              MR. TREANOR:  Right.
11              THE COURT:  And the U.S. Attorney's Office, to its
12    great credit, does not take the position anymore that it used
13    to take that you can't argue for a nonguidelines sentence.  It
14    just says that if you are sentenced to the guideline range or
15    lower you can't appeal or things like that.  That sometimes has
16    that waiver involved.  There are variations on the theme.  But
17    not the one that you're indicating.  So you're free to --
18              MR. TREANOR:  Correct, argue.
19              THE COURT:  -- argue for a nonguideline sentence.
20    Does the government agree?
21              MR. WILSON:  Oh, yes, sir.
22              THE COURT:  Let me hand this back to counsel.
23              MR. TREANOR:  Your Honor, of course, we would ask that
24    the Court sentence Mr. Faiella with leniency and to a sentence
25    that is as low as possible.  Now we recognize the fact that
```

F1K9FAIS                         Sentence

 1    that doesn't necessarily mean that no incarceration is

 2    appropriate.  We --

 3              THE COURT:  You're welcome, of course, to argue about

 4    anything you want, and I will be more than delighted to hear

 5    you.  But what I was trying to indicate in my earlier comments,

 6    just to move this along, is that you will have a very hard time

 7    convincing me that the sentence should be any less than

 8    Mr. Shrem's, given your client's prior felony conviction.

 9    Whether it should be lots higher, a little higher, whatever,

10    that's a different story.  Happy to hear any argument in that

11    area.  But -- and you're free to argue, of course, for an even

12    lower than Mr. Shrem.  And I've got all the time in the world

13    and I'd be happy to hear you, but it may not be the most

14    prudent use of your time.

15              MR. TREANOR:  Understood, your Honor.

16              When comparing this case to Mr. Shrem's case there are

17    obviously some differences.  There are differences in who these

18    individuals are and there are some somewhat subtle differences

19    in their conduct.  But I think our -- we would like to

20    analogize our case to Mr. Shrem's case and argue that a

21    sentence that's similar to the one imposed on Mr. Shrem is

22    appropriate.  We think that that -- the reason for that, the

23    reason that that's a compelling argument is that the nature of

24    the offense for these two individuals is quite similar.  You

25    know, when this case was charged there was a lot of attention

F1K9FAIS                     Sentence

1    paid to the fact that this was a bitcoin case that was

2    associated with Silk Road, Mr. Shrem was arrested with a large

3    sum of money in his bag in an airport, and there was a lot

4    about this case that made it look very cutting edge, like a

5    big-time case, a real interesting case.  I think the truth of

6    the matter is quite different.  Especially for Mr. Faiella,

7    more so than even Mr. Shrem.

8           This really is a very, very simple case.  It's a

9    simple case of -- it's about conduct committed by Mr. Faiella

10   laying on his back in his bed in Florida where he has some --

11   suffering some medical issues and was trying to find ways to

12   make a living, to be able to provide support for his family.

13          Now obviously he chose -- he made some mistakes and he

14   chose to do things that are illegal.  He's accepted that,

15   admitted that.

16          But really this is not a -- this case and the

17   sentencing range that is set forth in the plea agreement is

18   established in part based on an enhancement for being related

19   to narcotics trafficking.  And we would argue that -- we do

20   argue that this case is really so different from your typical

21   narcotics case.  In your typical narcotics case you have retail

22   sales on the street.  There's the prospect of violence.  The

23   sentencing -- granted the sentencing ranges for the guidelines

24   for narcotics trafficking have changed more recently, but they

25   were established in part with the violence that surrounds

F1K9FAIS                         Sentence

1    narcotics in mind.  And the enhancement here we believe has

2    something to do with that.

3           This offense that Mr. Faiella committed was really one

4    that was in the online world, totally virtual.  He was doing it

5    from his bedroom, engaged with people who were buying

6    narcotics, retail narcotics.  They were unknown people who he

7    was not dealing with face-to-face.  There really was no

8    prospect of violence.  There wasn't a lot of money involved in

9    this case.  I mean that's relative, but when you look at Silk

10   Road and how big an operation that was and you look at the

11   amounts that were involved with Mr. Faiella and Mr. Shrem, they

12   were relatively quite low.  There was not a lot of profit made

13   in this case.  And really what this is, it is a case of an

14   individual who had some tough breaks in life, some medical

15   issues, was rather desperate because he was unemployed, was

16   looking to support his family, and was poking around on the

17   internet and figured out that by advancing bitcoin to people he

18   could earn a little premium, a little cut.  And the people who

19   are most interested in getting a small premium from a bitcoin

20   sale were individuals who were buying narcotics on Silk Road.

21   And certainly Mr. Faiella sought to solicit those individuals.

22   He advertised on Silk Road's website.

23          But it's really a very, very simple case.  It's a very

24   simple crime.  It's not as complicated as one might think and

25   as it seems to have been depicted at times in the media.  It's

F1K9FAIS                      Sentence

1   a very, very simple case.  And we think that that speaks to the

2   limited nature of the sort of culpability of criminality in

3   this case.  We think it's a sort of lesser case within the

4   framework that it's been charged.

5          For that reason, we think that in some ways, because

6   Mr. Faiella was just an individual who was helping other

7   small-time retail individuals and not running a big business

8   like Mr. Shrem, we think that it's an even more compelling

9   argument on behalf of Mr. Faiella that this is -- this is not

10  the kind of conduct that warrants a sentence in the range of 57

11  to 60 months that the guidelines suggest is appropriate.  So

12  that's one way that we think that the case is favorably

13  distinguished from that of Mr. Shrem's.

14         Other I think compelling factors that are similar to

15  Mr. Shrem is the acceptance of responsibility here.

16  Mr. Faiella -- and of course we filed a motion challenging the

17  legal sufficiency of one of the charges.  We lost that motion.

18  And, of course, we don't think the arguments we raised were

19  crazy.  They were worth making.  But as soon as we lost that

20  motion, Mr. Faiella stepped up, accepted responsibility, pled

21  guilty, and is now here to be sentenced by your Honor.

22         There was some discussion, and the probation office

23  makes an issue in the report, of whether or not he sufficiently

24  accepted responsibility.  We had a little bit of a difficult

25  exchange with the probation office.  Tried to explain the fact

F1K9FAIS                          Sentence

1   that Mr. Faiella doesn't need to admit that he knew that the

2   licensing requirements precluded his conduct in order to be

3   guilty, that it's sufficient for him to have known that

4   engaging in the conduct that he engaged in, in a manner that

5   would facilitate the purchase of narcotics is a crime and he

6   accepts --

7          THE COURT:  Actually, the old adage is ignorance of

8   the law is no excuse.  He has to have mens rea.  And he has

9   admitted to recognizing that his conduct was morally wrong.

10         But I think point that was being made by the probation

11  officer, which you might want to address, it's one thing to say

12  you don't know about things like the licensing requirements for

13  a money transmitting business.  It's quite something else to

14  say that you don't know that by facilitating, purposely

15  facilitating the narcotics purchases of unlawful substances in

16  a way that's designed to conceal both your and their identities

17  and to prevent detection by law enforcement and to structure

18  the transactions to avoid attention, that you don't know that

19  you're involved in money laundering.  What else would it be?

20         MR. TREANOR:  Well, your Honor, I think my client

21  would readily admit that that is exactly what happened; is that

22  he engaged -- he was helping individuals to purchase bitcoin,

23  and he knew that they were using it to buy narcotics, and he

24  knew that was wrong.

25         THE COURT:  So how do you account for the fact that

1   the letters, the very fine letters that I received from his

2   wife and sister-in-law, mother-in-law, father, all or mostly

3   seem to suggest that he was not aware of the illegality of what

4   he was doing?

5          Again, he may not have been aware of the illegality of

6   the licensing side but on the money laundering side how could

7   he not be aware?

8          MR. TREANOR:  Your Honor, the count that he pled

9   guilty to is operating an unlicensed money transmitter.  And I

10  think that's the problem here.  The problem is that, having

11  pled guilty to that, it sounds a lot like did he know that he

12  was -- that he was operating a business that needed to be

13  licensed.  And the answer to that is -- is Mr. Faiella would

14  say that he didn't know; that he knew that there were licensing

15  issues around this business.

16         THE COURT:  I understand the government gave him the

17  benefit of a plea bargain that included his only having to

18  plead to the licensing, which, again he doesn't have to know

19  the technicalities of that law if he knows he's doing wrong as

20  he admitted he did when he pled.  But he was charged with money

21  laundering.  That's not before me from a sentencing standpoint.

22  But what I can't understand is what is he saying to his wife,

23  to his father, that leads them to basically feel, in letters

24  designed to help him and that do help him, by the way, they are

25  poignant letters in many respects; saying well he didn't really

F1K9FAIS                         Sentence

1   understand the illegality.  Yes, he may not have really

2   understood the illegality of the first count -- though I have

3   some questions in my mind about that, but we don't have to

4   dwell on that -- but he knew, as sure as anyone of his

5   intelligence and background knows, that facilitating and hiding

6   the purchases of illegal drugs is against the law as well as

7   being immoral.  How could he not know?

8            MR. TREANOR:  Well, your Honor, we don't take issue

9   with anything your Honor has said.  We think that's evident.

10  Mr. Faiella would say that that's evident.

11           I think the issue is that he's got family members who

12  love him and who know that he was interested in bitcoin, that

13  he took the position that he didn't need to be licensed;

14  whether that was right or wrong, he rationalized that part of

15  this.  I think that his family members are latching on to that

16  as a way to feel -- to defend him and to --

17           THE COURT:  Well, I accept that.

18           So you were telling me -- I don't know if there was

19  anything further you wanted to say.

20           I agree with you that if -- I'll of course hear from

21  the government on this -- if we were purely dealing with his

22  situation versus Mr. Shrem's situation, while there are

23  significant differences, there's a rough similarity on the

24  facts of this case.  But the big glaring difference is he's got

25  a prior felony conviction.  And I don't know if you want to say

1    anything about that, but that's the elephant in the room so to

2    speak.

3              MR. TREANOR:  Your Honor, he does.  He has a prior

4    felony conviction for a tax offense.  And it is what it is.

5    Mr. Faiella pled guilty to the tax offense and it's part of his

6    history.  It was not, in the scheme of things, a huge amount of

7    money involved.  It was a mistake.  And it's there.  I think

8    Mr. Faiella's aware that that is something that should in life

9    have put him on notice that he should have operated on the

10   straight and narrow.  But that comes back to the real -- the

11   real sort of story here, and that is when chosen -- when given

12   a choice between what to do when your family is in need,

13   Mr. Faiella chose what he thought -- whatever he thought at the

14   time.  He thought it didn't require a license.  He knew it was

15   a problem on the narcotics aspect of it.  He knew that when he

16   chose to engage in that conduct to try to make money to support

17   his family.  That's really the heart of it here, and that's

18   what led to that decision.  It's admittedly, certainly by

19   Mr. Faiella, it was a poor decision.  And he's ready to take

20   responsibility for that.

21             If I could have a minute, your Honor.

22             THE COURT:  Yes.

23             (Pause)

24             MR. TREANOR:  Your Honor, one additional point with

25   regards to the money laundering aspect of this.  Half an

1    education on a topic is a bad thing.  For Mr. Faiella when you

2    look at simplistically at things like the money laundering

3    statute, that means to the average lay person that you're

4    helping to wash money, criminal proceeds typically.  This was a

5    case in which --

6               THE COURT:  I understand the distinction.  And that's

7    a fair point.  But this is why I keep drilling, perhaps too

8    much, on the prior conviction.  Here's a man who had already

9    had serious trouble with the law in a, if you will, somewhat

10   technical area, tax evasion.  So, he wants to play lawyer and

11   say:  I can help these narcotics purchasers and my reading of

12   the licensing law or my reading of the money laundering law,

13   assuming he even bothered to read them, which I don't know,

14   makes me think maybe I can sneak in.  And the fact that I have

15   already received a felony conviction for not following the law

16   and knowing when I committed tax evasion that it was morally

17   wrong, and even though I know for a certainty that this is

18   morally wrong and I'm contributing at a very minimum to one of

19   the greater scourges that our society faces, you know, I,

20   Mr. Faiella, I didn't go to law school but by gosh I am now

21   going to play lawyer and convince myself that this is somehow

22   okay.

23               Is that the argument?

24               MR. TREANOR:  No, your Honor.

25               I think that hypothetical attributes too much thought

F1K9FAIS                      Sentence

1    to Mr. Faiella.  Notwithstanding the fact that we have

2    Mr. Shrem, who is clearly a young, bright man with a lot of

3    interesting ideas.  You have bitcoin which is a rather

4    sophisticated new, cutting-edge development.  I hope

5    Mr. Faiella --

6              THE COURT:  I agree with you that Mr. Shrem believes

7    that next only to the wheel bitcoin is the greatest invention

8    of our time, or of ever since the wheel was not of our time

9    but -- but I'm not sure how that cuts.

10             MR. TREANOR:  Well, your Honor, the point that I'm

11   trying to make, and I hope Mr. Faiella will forgive me for

12   this, but this is not a sophisticated man, your Honor.  He's

13   educated.  He has a college education.  But he was a plumber

14   before he ended up in the circumstances that he's in.  He's not

15   somebody --

16             THE COURT:  When my oldest daughter got married I was

17   so disappointed because, although she married a really terrific

18   guy, he was a lawyer.  I was hoping for a plumber, myself.

19             MR. TREANOR:  We all could use a good plumber, your

20   Honor.

21             I think that in going through -- trying to understand

22   the mental state of Mr. Faiella, I think to attribute too much

23   thought and complexity of thought would be wrong.  I think

24   Mr. Faiella is a pretty straightforward, simple guy.  I think

25   he was doing something that he was -- did a certain amount of

1   surface research to assure himself that he had cover, because

2   he felt that there was something morally wrong with helping

3   people buy drugs.  I think it's as simple as that.

4           THE COURT:  I don't want my comments to be taken out

5   of context.  I was impressed by the sincerity of Mr. Faiella's

6   plea, of his acceptance of responsibility.  I think there is no

7   doubt that he accepted responsibility in a way that not all

8   defendants genuinely do.  So I do take that into account.

9           Let me hear from the government.  Thank you.

10          MR. WILSON:  Thank you, your Honor.

11          Taking, as your Honor has suggested, I think, the

12  baseline here of Mr. Shrem's sentence, since that does seem to

13  be clearly the appropriate baseline to work from, the

14  government would offer that Mr. Faiella's culpability and the

15  necessary sentence here is significantly greater than

16  Mr. Shrem's for a variety of reasons, the first of which your

17  Honor has clearly already identified, which is here we have a

18  prior felony offense which seems to have had no deterrent

19  effect in that case.  Obviously, the sentence was probation and

20  a year's home confinement.

21          I don't want to dwell on it.  Your Honor has

22  identified all the issues and I don't -- unless you wish me to,

23  I don't think I need to address it further.

24          THE COURT:  I'll forego that pleasure.

25          MR. WILSON:  There are a number of other issues here

1    though and I think keying off that one to look at very clearly

2    is the need for specific deterrence in this case.  Obviously I

3    have not been counsel on this throughout and I've only read the

4    sentencing transcript from Mr. Shrem, but my understanding and

5    my sense of your Honor's views is that specific deterrence of

6    Mr. Shrem was not a particularly key issue there, I don't

7    think.  The government thought it was a key issue, and it seems

8    to have largely been presumed that that wasn't what we were

9    worried about.

10           THE COURT:  I think that's a fair point.  And I'm

11   going to give, of course, defense counsel a chance to respond

12   to any of these points before we hear from the defendant

13   himself.  But usually in white collar cases -- this is really

14   in some respects a white collar case; that's one of the points

15   that defense counsel, in fact, was making, that this is not a

16   case involving violence -- you don't have to worry about

17   specific deterrence.  These are folks who make serious mistakes

18   but very rarely are recidivists.  You'll get, every once in a

19   while, the professional conman.  But in a situation like

20   Mr. Shrem's or, one would have thought, Mr. Faiella's you don't

21   have to worry about specific deterrence.  But in his case

22   clearly he didn't learn the lesson.  And so the notion is that

23   a greater sentence may carry that message.

24           MR. WILSON:  Yes, your Honor.  And I think it goes

25   beyond just the prior felony and the willingness to reoffend

F1K9FAIS                          Sentence

and there are just a couple of other points I want to point you

to.

        In this case Mr. Shrem obviously ultimately stopped

providing bitInstant services to the defendant.  And at that

time he understood that the reasons were because they were

having issues with what he was providing.

        That did not stop Mr. Faiella, which you might have

thought would have been a warning sign.  Instead, he

reorganized himself and began essentially doing the exchanges

directly through personal accounts and the trust account on

Silk Road.

        Then Silk Road was seized.  And that, you would

certainly have thought, would have been enough of a warning for

anyone who was easy to deter, that this business was no longer

one he could safely engage in and that he needed to stop.  But,

as your Honor knows, that's not what happened.  The successor

Silk Road 2 spinoff website went up and the defendant continued

the same conduct on that website until his arrest.

        That's a lot of opportunities for him to have stopped,

none of which he took and, I think, suggests a real

possibility, if not a likelihood, that absent a very

substantial sentence here, beyond what we were ever talking

about with Mr. Shrem, he may continue to commit crimes.

        I think you also have to look, your Honor, in this

capacity, as you've said, white collar crimes, generally this

F1K9FAIS                    Sentence

isn't an issue, partly because they are often one-time mistakes

and you learn your lesson, but also because the risks of being

caught in future are so high in many white collar offenses.

One of the unique problems that we face in this type

of offense, with due respect to defense counsel, I think is not

so simple, is the potential for anonymity.  I think this also

goes to what I think is not accurate about Mr. Faiella being a

simple man or an uncomplicated man.  He took extensive steps

throughout this process ultimately once he lost BitInstant, not

effective steps, but nonetheless extensive ones, to maintain

his anonymity, to maintain deniability, to avoid law

enforcement detection.  That is a real possibility in the world

in which we now live for this type of offense.

I agree, your Honor, there are some things with

Mr. Shrem that cut the other way, the obvious one being

subversion of a legitimate enterprise, a denial of the

regulations; but cutting the other way is that this is the type

of offense Mr. Faiella could, if he so chose, tried to commit

as soon as he's no longer in confinement.  He can go online.

He can create, unfortunately, largely untraceable -- or at any

rate very difficult to trace mechanisms for doing this sort of

business.  And the government will have to start from square

one.  We did not find Mr. Faiella in a vacuum.  It's only

because of the successful Silk Road investigation that you

would become aware of someone doing this.  If he's not part of

F1K9FAIS                        Sentence

1    a website which the government is able to successfully

2    investigate and take down in the future, there is no

3    particularly clear reason to believe that the government would

4    catch him if he tried a similar scheme in the future, all of

5    which I think points very clearly to the need for a significant

6    or a significantly larger sentence than Mr. Shrem would receive

7    to deter him, frankly to incapacitate him as well, to make sure

8    that is not a possibility and that when he does comes out he

9    knows it's not worth it to try this sort of thing again.

10           Another issue which is perhaps in the same vein in

11   that it suggests --

12           THE COURT:  I'm not sure -- it's been a while since

13   I've looked at Section 3553(a) -- I'm not sure that

14   incapacitation is something I can take account of, is it?

15           MR. WILSON:  Well it's to protect society from future

16   crimes by the individual.  I think it encompasses both specific

17   deterrence and --

18           THE COURT:  I think I'd prefer specific deterrence.  I

19   think I'm uncomfortable, as a legal matter, with

20   incapacitation.

21           MR. WILSON:  Fair enough.  In this case I think the

22   issue is clear in terms of specific deterrence.

23           This turns I think also to the point of -- I don't

24   know that it's acceptance of responsibility.  I agree with your

25   Honor that plainly he has accepted responsibility for the

F1K9FAIS                        Sentence

1    illegal elements of this offense.  But as it looks to the

2    possibility of recidivism here, the defendant's, I think,

3    continued assertion of things that are plainly not true about

4    his knowledge is troubling, as are a couple of other matters.

5           But starting with that.  The defendant, as you noted,

6    his family has asserted it, I think his counsel has asserted

7    it, that he simply did not know that he needed to be licensed.

8    And that's not one of the elements of the offense, and he

9    doesn't have to admit.  But there's a difference between not

10   admitting it and asserting as a mitigating factor that he

11   didn't understand.

12          Your Honor has the PSR.  It's paragraph 57.  But it

13   could not possibly be more clear that by July 2013 at the

14   latest, which is approximately six months before he ceases his

15   conduct when he's arrested, he knows that a money services

16   business, which bitcoin exchange business is, had to be

17   licensed.  And he's explaining to the Dread Pirate Roberts why

18   he doesn't want to move out of his current system which offers

19   him more protection, precisely because since he has to be

20   licensed and he's not, if law enforcement finds him, they are

21   going to seize the funds and him, as I think the quote --

22          THE COURT:  I'm glad you remind about paragraph 57.  I

23   should note for the record that I'm adopting the factual

24   findings of the presentence report.  This details, in quite

25   significant particularity, all the circumstantial evidence that

1    shows that by July 30, 2013 he was specifically aware that he

2    was operating an unlicensed money transmitting business.

3    That's a good point.  Thank you.

4            MR. WILSON:  Certainly, your Honor.

5            So obviously I think your Honor takes the point the

6    fact that he did know and he's now claiming he didn't still,

7    despite having been willing to plead guilty to the particular

8    elements of the offense, I think is troubling to the

9    government.

10           I'll also note along the same vein there has been this

11   claim that's made by Mr. Faiella that he only made $30,000.  I

12   don't know if the particular amounts here are necessarily

13   significant.  But it seems clear that that is not true.

14           As your Honor will know from the PSR details, the

15   commission that Mr. Faiella was charging was in the range of

16   nine to ten percent.  Mr. Shrem, for the ones he was

17   processing, which is only a portion, of course, was taking two

18   percent.  And we're talking at a minimum just during the

19   BitInstant period of the -- well, it's more than a million in

20   total transactions.  The government and the defense have agreed

21   that it's approximately 950,000 in drug transactions that are

22   being funded.  That's 70 to 80,000 at the bare minimum.  I

23   don't know why Mr. Faiella is feeling the need to cut that in

24   half but it's very troubling to the government that he's trying

25   to minimize his culpability here.  The profit numbers are not

F1K9FAIS                          Sentence

1    huge, obviously.

2              THE COURT:  Yes.  Well I want to hear from his counsel

3    on that point.  I should make clear that the portion of his

4    acceptance which I do credit is I do think that he has

5    recognized and has made clear to the Court that he always

6    recognized that what he was doing was wrong.  But I think you

7    have raised some troubling issues as to some more

8    particularized aspects of his state of mind.

9              MR. WILSON:  I think, your Honor, to sum it up from

10   the government's perspective, and I know you're familiar with

11   the term, we would certainly view what he is doing here is

12   trying to minimize his conduct.  He's admitted he knew what he

13   was doing was wrong, he's acknowledged his guilt.  But he

14   continues to try to minimize it in hopes of getting a lighter

15   sentence; and not only should your Honor not give him a lighter

16   sentence based on those false statements, but the fact that

17   he's making them I think raises real concerns about the

18   likelihood of re-offense here.

19             I think turning probably away from the specific

20   deterrence issues, and I know your Honor has considered and

21   addressed it at some length with Mr. Shrem, the seriousness of

22   the offense and the need for general deterrence, so I won't

23   belabor those points.

24             THE COURT:  Every case is, obviously, particularized

25   but in that respect, of course, the comments I made at

1    Mr. Shrem's sentence apply equally to this situation.

2           MR. WILSON:  All I would say there are a couple of

3    ways in which I think both of those cut in favor of the need

4    for a greater sentence for Mr. Faiella than for Mr. Shrem.

5           The first, with respect to the seriousness of the

6    offense, he's obviously here, the defendant, now he's the

7    principal.  Mr. Shrem aided him.  He facilitated his conduct

8    for part of the period.  But the principal here, the one who

9    originated the scheme, the one who was on Silk Road, the one

10   who knew, not just as Mr. Shrem knew, certainly, that this was

11   facilitating illegal drug conduct, but literally was receiving

12   messages from undercovers stating, "I'm using this money to buy

13   cocaine," that's the defendant.  We think that's a more serious

14   version of the offense, obviously.

15          In addition, he did it for longer.  He began in

16   December 2011.  Mr. Shrem ceases working with him in

17   October 2012.  But Mr. Faiella continues to do it for more than

18   a year after that until his arrest in January 2014.  Your Honor

19   can do the math but it's twice as long.  And that is something

20   that goes to the seriousness of the offense and the defendant's

21   culpability and warrants a greater sentence to reflect it.

22          Finally, with respect to general deterrence, your

23   Honor, I think the one point that is worth making is precisely

24   for the same reason specific deterrence is more of a concern

25   here than it would often be in white collar crimes, because of

F1K9FAIS                         Sentence

1    the ability to do this anonymously, and to have some degree of

2    serious success in concealing your activity or your identity

3    from law enforcement, deterrence for others also requires that

4    when the government does locate one of the people doing this

5    and bring them to court and prove them guilty, that the

6    sentence be significant and not to call back to --

7            THE COURT:  In effect what you're saying is when

8    someone comes up with a better mousetrap for committing a crime

9    you can't ignore the fact that they invented a new way to

10   accomplish that crime and the word's got to get out that that's

11   no good, it's just as bad as committing the crime the old way.

12   So I think there is something to that.

13           MR. WILSON:  You said it better than I was going to,

14   your Honor.

15           THE COURT:  I doubt that.  But anyway let me hear from

16   defense counsel and then from the defendant.

17           MR. TREANOR:  Your Honor, just to address a couple of

18   issues.  First of all, with regards to the exchange with Dread

19   Pirate Roberts, the licensing issue.  That e-mail exchange,

20   that exchange was basically a request from the Pirate, as he

21   was referred to, for Mr. Faiella to alter his business in a way

22   that was more of a specific exchange for Silk Road.

23   Mr. Faiella turned down that offer.  And it is in that context

24   that he said money service businesses require a license.  And

25   it was not his view that he was a money service business at

1    that time.  He looked at himself as an individual-to-individual

2    peer operation; not like Mr. Shrem, or not like what Dread

3    Pirate Roberts was asking him to do.  And he declined that

4    offer.  And that proves, in a sense, the issue of whether he

5    was parsing in his mind the licensing issue and feeling that

6    maybe he didn't need one.

7            But setting that aside, because that -- we think that

8    discussion is not particularly relevant because he knows that

9    he was helping people buy drugs and he knows that that was

10   wrong and that's the basis of why he's here.  So, we don't find

11   that that e-mail supports the government's argument.

12           With regards to the amount made by Mr. Faiella, we

13   don't take issue with the 60, 70, 80, whatever thousand dollars

14   he made from this.  Mr. Faiella was sharing some of his

15   proceeds with someone else who at times contributed to the

16   conduct.  And in that sense --

17           THE COURT:  Whoa, whoa, whoa.  What does that mean?

18           MR. TREANOR:  Your Honor that means that Mr. Faiella

19   is an individual who is incapacitated, is in bed for most of

20   the day, and at times, when the business got busy, had help.

21           THE COURT:  So you mean there is another person

22   unknown, presently unknown who was involved in this crime?

23           MR. TREANOR:  That may be correct, your Honor.

24           And also with regards to the split with Mr. Shrem --

25           THE COURT:  I'm not sure which way that cuts.  What

F1K9FAIS                        Sentence

1    was the background of this individual?

2              MR. TREANOR:  Your Honor, I can't supply any

3    additional information.

4              THE COURT:  Because you can't or because your client

5    has asked you not to?

6              MR. TREANOR:  Because I can't.

7              Your Honor, the additional fact, Mr. Shrem's split in

8    this was not two percent; it was four percent.  So that took up

9    a greater percentage of the proceeds of the transactions that

10   they did together.

11             With regards to specific deterrence --

12             THE COURT:  Let me just -- I'm still troubled.  So

13   Mr. Faiella says I should accept that he only made $30,000.

14   That's something he raised.  And the government says how can

15   that be?

16             MR. TREANOR:  We don't take issue --

17             THE COURT:  And you're saying they're right with

18   respect to what the total commission was.

19             MR. TREANOR:  I'm just saying --

20             THE COURT:  But he had to split it with another crook?

21             MR. TREANOR:  Your Honor, I think, walking back the

22   math, I don't say that we agree with the government's

23   calculation of the amount of proceeds here.  We don't take

24   issue with it.  It sounds like it's in the right ballpark.

25             THE COURT:  You've just told me, and the record I'm

1    sure reflects, that he had to split his commission with someone

2    else.

3              MR. TREANOR:  Correct.  I'm starting with the total

4    proceeds, your Honor.

5              THE COURT:  I understand that.

6              This is something he raised.  In order for me to

7    evaluate that, I'd like to know a little bit more because it

8    may bear on his sentence, among other things.

9              MR. TREANOR:  Your Honor, I don't have any additional

10   facts to provide on that.  I can give you a breakdown of the

11   proceeds as we understand it.  We don't take issue with what

12   the government has raised.  We do take issue with the fact that

13   Mr. Shrem's split was not two percent; it was four percent.

14             THE COURT:  Anything else from defense counsel?

15             MR. TREANOR:  Your Honor, two additional things.

16             One is with regards to specific deterrence.

17   Mr. Faiella is not a one-man crime wave.  This is a case in

18   which he was charged by the IRS with underreporting the

19   proceeds of his plumbing business.  He pled guilty to that.

20   That was a very, very simple tax case.

21             And then this individual got back on the internet,

22   because he's incapacitated, was looking for ways in which he

23   could make some money on the internet and did what he did.

24             But he's not an individual who has a lot of

25   opportunity to commit criminal conduct and he's somewhat of a

1    broken-down man at this point in his life.  And we think that

2    that's a very important sort of mitigating factor on the

3    specific deterrent.

4           I also would be remiss if I didn't mention the fact

5    that notwithstanding Mr. Faiella's flaws he does have a family

6    who cares very much about him.  His wife, Suzanne is here.  And

7    they -- the family is going to -- when he is sentenced and

8    serves a sentence, a likely sentence of incarceration, he's

9    going to be away from them.  They have difficult circumstances.

10   They have a very promising young son.  And Mr. Faiella is an

11   important part of their lives.  And we would just note that

12   they are going to lose him for that period of incarceration.

13          THE COURT:  Thank you very much.  Let me hear from

14   Mr. Faiella if he wishes to be heard.

15          THE DEFENDANT:  Well, your Honor, at the time of the

16   offense I saw no other way.  It still doesn't mitigate that I

17   broke the law.  And I'm here to face the responsibility of

18   that.  It's pretty simple, your Honor.  Whatever you sentence

19   me to, that's what I deserve.

20          THE COURT:  So, it is the quality of Mr. Faiella that

21   comes across in that short statement just now and that has come

22   across to the Court previously that is his, in effect,

23   strongest argument for mitigation.  When push comes to shove,

24   this gentleman does accept responsibility; doesn't equivocate.

25   There may be things in his submission that are arguable, but

F1K9FAIS                         Sentence

1    the bottomline is really the one he just expressed so

2    eloquently now.

3            There are other things that also operate in his favor:

4    His medical problems, the situation economically which he found

5    himself in when he undertook this activity, and always very

6    important to the Court, and no less so here, the impact of any

7    sentence on his fine family.

8            But, there is a fair amount on the other side of the

9    balance, much of which I think has been eloquently captured by

10   the government.  He continued this activity long after there

11   were warning signs from every corner.  He knew from his own

12   past criminal history the nature of the risk he was taking and

13   he willingly assumed those risks.  He engaged in activity which

14   I agree with the government is not as simple as defense counsel

15   would argue.  He is sought to make use of a novel medium of

16   exchange to facilitate drug purchases in the belief that the

17   very nature of that exchange and its novelty would provide a

18   particularly useful cover.  And though I don't know quite what

19   to make of it and it won't be a material fact in my sentence,

20   he apparently did this in collusion with an unnamed individual

21   whose anonymous identity he seeks to take advantage of through

22   his counsel even here today as a mitigating factor for how much

23   money he received.  This is not an appealing picture.  I agree

24   with the government moreover that this is one of those

25   relatively rare cases where specific deterrence is clearly

F1K9FAIS                         Sentence

1    called for and general deterrence surely is called for, for

2    reasons already outlined.

3           There is no magic in the guidelines.  I pay as little

4    attention to the guidelines as the law permits me to do, and

5    that's very little.  Because they are, as I've gotten tired of

6    saying, inherently irrational.

7           THE DEFENDANT:  Your Honor --

8           THE COURT:  But -- yes.

9           MR. TREANOR:  Your Honor, can I have a minute, please?

10          THE COURT:  Yes.

11          (Pause)

12          MR. TREANOR:  Your Honor, if I could have a minute,

13   please?

14          (Pause)

15          MR. WILSON:  Your Honor in the interim I'll just pass

16   up the order of forfeiture to your deputy.

17          THE COURT:  Yes.

18          (Pause)

19          THE COURT:  Counsel.

20          MR. TREANOR:  Your Honor, we're fine to proceed.

21          THE COURT:  All right.

22          So I am not being much affected, and rarely have, by

23   the guidelines.  What I am affected by is the need for specific

24   deterrence, for general deterrence, for the nature of the crime

25   involved.  All of those, regretful to say, cut in favor of a

 1    sentence substantially above that of Mr. Shrem.

 2            So the sentence of the Court is that the defendant is

 3    sentenced to 48 months in prison, in other words four years; to

 4    be followed by three years of supervised release on terms I'll

 5    get to in a minute.

 6            No fine will be imposed because the defendant has

 7    already entered into a very substantial forfeiture agreement

 8    which the Court has now signed.  There is, however, a special

 9    assessment of one hundred dollars that is mandatory and must be

10    paid.

11            The terms of supervised release are:

12            First, the mandatory conditions that the defendant

13    shall not commit any other federal, state, or local crime.

14            The defendant shall not illegally possess any

15    controlled substance.

16            The defendant shall not possess any firearm or

17    destructive device.

18            That the defendant shall cooperate in the collection

19    of DNA.

20            The defendant, within fifteen days of his placement on

21    supervised release, will submit to one drug test, to be

22    followed thereafter by two other unscheduled drug tests as

23    directed by the probation officer.

24            There will also be imposed the standard conditions of

25    supervision 1 through 13.  They appear on the face of the

F1K9FAIS                              Sentence

1   judgment and will be gone over with the defendant by the

2   probation officer when the defendant reports to begin his

3   period of supervised release.

4           Finally, there are the special conditions.

5           First, that the defendant is to report to the nearest

6   probation office within 72 hours of his release from custody.

7           Second, that he will be supervised by the district of

8   his residence.

9           Now, before I advise the defendant of his right of

10  appeal and before we talk about surrender date, is there

11  anything else that either counsel needs to raise with the

12  Court?

13          Anything from the government?

14          MR. WILSON:  Two things, your Honor.

15          I think there were a couple of objections which

16  were -- to the PSR which were resolved in a manner by

17  probation.  If we could just confirm on the record that there

18  are no continuing objections from the defense to the PSR?

19          THE COURT:  Yes.

20          Is that correct?

21          MR. TREANOR:  I'm sorry, your Honor?

22          THE COURT:  Are there any further objections,

23  continuing objections to the PSR?

24          MR. TREANOR:  No, your Honor.

25          THE COURT:  Okay.

F1K9FAIS                           Sentence

1              MR. WILSON:  And the other is the government would

2       move to dismiss the open counts.

3              THE COURT:  That motion is granted.

4              Anything from defense counsel?

5              MR. TREANOR:  Your Honor, a couple of things.

6              First of all, we ask that Mr. Faiella be designated to

7       a facility where we can receive medical attention.

8              THE COURT:  Yes.  I have no power to order that but I

9       will certainly recommend it.  It is well called for here.

10             MR. TREANOR:  Thank you, your Honor.

11             With regards to the current conditions of

12      Mr. Faiella's supervision, obviously he's going to have to

13      report to a facility.  He's had a lot of difficulty under

14      strict pretrial supervision making medical appointments and the

15      like.  I know your Honor may not be in a position to address a

16      motion to adjust his supervision to regular pretrial

17      supervision, but I thought I would raise it now in case it's

18      not a good use of the Court's time to raise such a --

19             THE COURT:  If you want to make any alterations,

20      jointly call my chambers with your adversary and I'll take them

21      up.  I would only do it with the approval of the probation

22      office, but anything that both the government and the probation

23      office approve, I would be willing to hear.  Don't guarantee

24      I'll accept it, but I may.

25             MR. TREANOR:  Understood, your Honor.

1              THE COURT:  All right.  In terms of surrender, my

2     courtroom deputy suggests Tuesday, March 3 at 2:00 p.m. so

3     unless there's any objection to that, that's what it will be.

4              And Mr. Faiella, you have a right to appeal the

5     sentence.

6              Do you understand that?

7              MR. TREANOR:  Your Honor, Mr. Faiella understands he

8     signed away his right to appeal within the plea agreement,

9     but --

10             THE COURT:  Yes.  I'm sorry.  Thank you for reminding

11    me that because the sentence is below the 57 months or below 60

12    months, so you have previously waived your right of appeal.  So

13    I have to rephrase that.

14             But you should talk with your counsel anyway to be

15    absolutely sure because if there was any ground for appeal, and

16    I don't see any, but if there were you would have to file your

17    notice of appeal in ten days.

18             Do you understand that?

19             THE DEFENDANT:  Yes, I do.

20             THE COURT:  And if you do file an appeal and you can't

21    afford counsel for the appeal, the Court will appoint one for

22    you free of charge.

23             Do you understand that?

24             THE DEFENDANT:  Yes.  I understand.

25             THE COURT:  Very good.  Thanks a lot.

F1K9FAIS                           Sentence

1          MR. TREANOR:  Your Honor one just issue that I just

2     wanted to just call your Honor's attention to.  Mr. Faiella had

3     previously raised this with the government but he has

4     considered back surgery and he is in discussions about when

5     that surgery might take place.  It's not scheduled.  It's not

6     even definite it's going to happen, but I just wanted to alert

7     your Honor to that.

8          THE COURT:  Well I think you need to bring that to a

9     head one way or the other because if he needs back surgery of

10    course we want that to occur but I don't want to be -- receive

11    a call a week before surrender date and say he has just decided

12    to have back surgery.  So that needs to be addressed sooner

13    rather than later but thank you for raising it.

14         THE DEPUTY CLERK:  Judge I assume he wants to

15    surrender to the institution.

16         THE COURT:  Yes.

17         (Adjourned)

18

19

20

21

22

23

24

25